# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, | Case No. 1:24-cv-00943-EPG-HC |
| Petitioner, | ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| CHRISTOPHER CHESTNUT, et al.,[1] | ORDER SUBSTITUTING CHRISTOPHER CHESTNUT IN THE PLACE OF MINGA WOFFORD, SUBSTITUTING SERGIO ALBARRAN IN THE PLACE OF MOISES BECERRA, AND DISMISSING REMAINING RESPONDENTS |
| Respondents. | |

Petitioner John Doe, represented by counsel, is a federal immigration detainee proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. The parties have consented to the jurisdiction of a United States magistrate judge. (ECF Nos. 4, 10, 11.)

---

[1] "[L]ongstanding practice confirms that in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held . . . ." Rumsfeld v. Padilla, 542 U.S. 426, 435 (2004). The Ninth Circuit has "affirm[ed] the application of the immediate custodian and district of confinement rules to core habeas petitions filed pursuant to 28 U.S.C. § 2241, including those filed by immigrant detainees." Doe v. Garland, 109 F.4th 1188, 1199 (9th Cir. 2024). At the time of the petition's filing, Petitioner's custodian was the facility administrator at the Golden State Annex Detention Facility. As Petitioner has been transferred to the California City Detention Facility, the proper respondent is the Warden or Facility Administrator at the California City Detention Facility. Accordingly, Christopher Chestnut is substituted as Respondent in this matter.

Respondents also move to strike and dismiss all unlawfully named officials. (ECF No. 18 at 1 n.1.) Although Doe held that "Padilla set forth a clear rule requiring core habeas petitioners challenging their present physical confinement to name their immediate custodian, the warden of the facility where they are detained, as the respondent to their petition," 109 F.4th at 1197, Doe did not necessarily preclude naming more than one respondent so long as the immediate custodian is named. Given that Petitioner has named his immediate custodian as a Respondent, the Court declines to dismiss all the remaining named Respondents. At the November 19, 2025 hearing, Petitioner's counsel indicated that Sergio Albarran, who is the current Director for the San Francisco ICE Field Office, is an appropriate Respondent.

# I.

## BACKGROUND

Petitioner is a citizen of Mexico who has lived in the United States since he was eight years old and became a permanent resident on July 26, 2000. (ECF No. 1 at 6.[2]) In 2010, Petitioner was babysitting the child of one of Petitioner's cousins who had molested Petitioner when he was a child. Petitioner alleges that "[i]n a grave lapse of judgment, Mr. Doe lost control while playing a jumping game with the victim. Thinking about the abuse he suffered, he pulled the victim's underpants roughly for several seconds, which caused an injury to her vagina." (ECF No. 1 at 7.) Petitioner tried to clean up the blood, cleaned the victim's clothes, got rid of her underwear, and did not say anything to her parents. (Pet'r Ex. G at 5,[3] ECF No. 1-9.) The victim was admitted to the hospital on June 29, 2010, and discharged on July 6, 2010. (Pet'r Ex. H at 49, 63,[4] ECF No. 1-10.) The declaration of Petitioner's criminal defense counsel states that counsel retained the services of a Forensic Sexual Assault Nurse Examiner ("SANE") to review and interpret the results of the Sexual Assault Response Team ("SART") examination. (Pet'r Ex. G at 110.) The SANE concluded that the injuries did not appear sexual in nature but were more consistent with a straddle-type injury. Additionally, the prosecution never discovered any DNA evidence suggesting a penetrative sexual injury. (Id.) One police report documents a conversation an officer had with the emergency room doctor who had examined the victim. The doctor told the officer that he observed bruising on the outer vulva area, linear bruising along the lines where underwear would be, a laceration on the vaginal opening, and coagulated blood inside the vaginal canal. (Pet'r Ex. H at 35.) Another police report documents a conversation an officer had regarding the SART exam with someone who appears to be a medical professional. The person stated there were several abrasions in the genital area, a specific fresh abrasion with oozing blood between the labia majora and labia minora, bruising on the side of the clitoris, and abrasions around the anus. The person indicated that this appeared to be most likely caused by

---

[2] Page numbers refer to ECF pagination stamped at the top of the page.
[3] Page numbers refer to the Bates numbering.
[4] Page numbers refer to the Bates numbering.

1    attempted penetration of the vagina and anus and sexual abuse. (Pet'r Ex. H at 53–54.) In 2011,

2    Petitioner pleaded no contest to two counts of lewd acts upon a child and one count of child

3    endangerment. (ECF No. 1 at 7; Pet'r Ex. H at 28.) Petitioner was sentenced to an imprisonment

4    term of eleven years and four months. (Pet'r Ex. H at 28.)

5         In March 2020, Petitioner was released on parole after serving ten years in prison. (ECF

6    No. 1 at 7.) The Board of Parole Hearings ("BPH") conducted a screening test and declined to

7    refer Petitioner for an evaluation under the Sexually Violent Predator ("SVP") program, finding

8    that he did not "meet the case factors and clinical evaluation criteria for referral to SVP." (Pet'r

9    Ex. G at 159.) Upon release, Petitioner registered as a sex offender and will continue to do so for

10   the rest of his life. (ECF No. 1 at 8.)

11        On June 1, 2021, fifteen months after his release from prison, Petitioner was detained by

12   U.S. Immigration and Customs Enforcement ("ICE") at a routine parole check-in pursuant to 8

13   U.S.C. § 1226(c). (ECF No. 1 at 8–9 & n.2; ECF No. 18-1 at 2.) On June 1, 2021, the

14   Department of Homeland Security ("DHS") issued a Notice to Appear ("NTA") charging

15   Petitioner with removability pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) for having an aggravated

16   felony conviction. The immigration judge ("IJ") found Petitioner statutorily ineligible for a bond

17   hearing. (ECF No. 1 at 9.)

18        Petitioner applied for deferral of removal under the Convention Against Torture ("CAT")

19   and sought readjustment of status with a waiver of inadmissibility under Immigration and

20   Nationality Act ("INA") § 212(h). (ECF No. 1 at 9.) On September 7, 2022, the IJ denied

21   Petitioner's applications for relief and ordered Petitioner removed to Mexico. (ECF No. 1-4.) On

22   February 14, 2023, the Board of Immigration Appeals ("BIA") summarily affirmed the IJ's

23   decision without opinion. (ECF No. 1-5.)

24        Petitioner appealed the BIA's decision to the Ninth Circuit, which granted the petition for

25   review on April 19, 2024, and remanded the matter based on the IJ's failure to adequately

26   consider expert testimony on Petitioner's risk of torture in Mexico. (ECF No. 1-6.) On January 8,

27   2025, the BIA, in turn, remanded the matter to the immigration court for further proceedings.

28   (ECF No. 13-1.)

1    Meanwhile, Petitioner filed a petition for writ of habeas corpus in the United States

2    District Court for the Northern District of California, challenging his prolonged detention on

3    procedural due process grounds. (ECF No. 1 at 10.) On September 1, 2023, the district court

4    granted the petition and ordered a bond hearing at which "DHS must establish by clear and

5    convincing evidence that Petitioner is a flight risk or a danger to the community in order to

6    continue his detention." Doe v. Becerra, No. 23-cv-02382-DMR, 2023 WL 5672192, at *4 (N.D.

7    Cal. Sept. 1, 2023). On September 12, 2023, an IJ conducted a bond hearing and denied bond.

8    (ECF No. 1-12.)

9    Petitioner appealed, and on January 31, 2024, the BIA granted Petitioner's appeal,

10    finding that the IJ's decision "cannot be upheld as currently constituted" because it is "unclear

11    whether the burden was consistently applied when analyzing whether [Petitioner] presents a

12    danger to the community" and the IJ did not "meaningfully address the tests and tools underlying

13    the expert's determination." (ECF No. 1-13.) The BIA remanded the matter, directing the IJ to

14    "issue a new decision that reflects proper application of the burden of proof," "consider and

15    address the record evidence more fully," "enter more detailed factual findings and legal

16    conclusions as to whether [Petitioner] presents a future danger to the community," and "assess

17    anew whether DHS has submitted sufficient evidence to outweigh" Petitioner's "lengthy

18    residence in the United States, his strong family and community ties, his education and

19    employment history, and his prospects for future employment" so as to establish that he is "such

20    a significant flight risk that no bond or release conditions could mitigate the risk." (ECF No. 1-

21    13.) On February 26, 2024, the IJ issued a new decision denying bond. (ECF No. 1-14; ECF No.

22    18-1 at 17–25.) On October 22, 2024, the BIA declined to reverse the IJ's findings "[g]iven the

23    deferential nature of our review as to the underlying factual findings[.]" (ECF No. 18-1 at 32.)

24    Meanwhile, on June 26, 2024, Petitioner filed a petition for writ of habeas corpus in the

25    United States District Court for the Northern District of California, challenging his prolonged

26    detention on substantive due process grounds. (ECF No. 1 at 13.) On July 31, 2024, the Ninth

27    Circuit issued Doe v. Garland, 109 F.4th 1188, 1199 (9th Cir. 2024), which "affirm[ed] the

28    application of the immediate custodian and district of confinement rules to core habeas petitions

1  filed pursuant to 28 U.S.C. § 2241, including those filed by immigrant detainees." Accordingly,

2  Petitioner filed a notice of voluntary dismissal. (ECF No. 1 at 14.)

3      On August 14, 2024, Petitioner filed the instant petition for writ of habeas corpus in this

4  Court challenging his prolonged detention on substantive due process grounds. (ECF No. 1.) On

5  May 6, 2025, the Court denied Respondents' motion to dismiss. (ECF No. 15.) Respondents filed

6  an answer, and Petitioner filed a traverse. (ECF Nos. 18, 19.) On September 11, 2025, Petitioner

7  filed a notice that he was transferred from Golden State Annex ("GSA") to California City

8  Detention Facility ("California City") on August 29, 2025, along with a supplemental declaration

9  regarding conditions at California City. (ECF No. 20.) On November 19, 2025, a hearing was

10  held on the petition. (ECF No. 23.)

11                                   **II.**

12                             **DISCUSSION**

13  **A.  Jurisdiction**

14      Respondents argue that "[a]s a threshold matter, in immigration cases, this federal court-

15  of-custody lacks jurisdiction to review decisions for which the immigration and naturalization

16  statutes grant 'discretion' to the Attorney General," citing to 8 U.S.C. § 1252(a)(2)(B),

17  Gutierrez-Chavez v. I.N.S., 298 F.3d 824, 829 (9th Cir. 2002), and Sol v. INS, 274 F.3d 648, 651

18  (2d Cir. 2001). (ECF No. 18 at 7.) Section 1252 is entitled "Judicial review of orders of

19  removal," and provides in pertinent part:

20          Notwithstanding any other provision of law (statutory or
21          nonstatutory), including section 2241 of Title 28, or any other
            habeas corpus provision, and sections 1361 and 1651 of such title,
22          and except as provided in subparagraph (D), and regardless of
            whether the judgment, decision, or action is made in removal
23          proceedings, no court shall have jurisdiction to review--

24              (i) any judgment regarding the granting of relief under section
                1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
25
                (ii) any other decision or action of the Attorney General or the
26              Secretary of Homeland Security for which the authority for which is
                specified under this subchapter to be in the discretion of the
27              Attorney General or the Secretary of Homeland Security, other
                than the granting of relief under section 1158(a) of this title.

28  8 U.S.C. § 1252(a)(2)(B). First, the Court notes that Petitioner is detained under 8 U.S.C.

1    § 1226(c), which *mandates* detention, and thus, is not a matter of discretion. See Jennings v.

2    Rodriguez, 583 U.S. 281, 296 (2018) (finding "the extent of the Government's [immigration]

3    detention authority is not a matter of 'discretionary judgment,' 'action,' or 'decision'"). Second,

4    the Ninth Circuit has rejected this argument, holding that "§ 1252(a)(2)(B)(ii) restricts

5    jurisdiction *only* with respect to the executive's exercise of discretion. It does not limit habeas

6    jurisdiction over questions of law." Hernandez v. Sessions, 872 F.3d 976, 988 (9th Cir. 2017)

7    (quoting Singh v. Holder, 638 F.3d 1196, 1202 (9th Cir. 2011)). See Nielsen v. Preap, 586 U.S.

8    392, 420 (2019) (noting that "constitutional challenges to the applications of" § 1226(c) are "not

9    foreclose[d]"). Third, Gutierrez-Chavez and Sol concerned § 2241 habeas jurisdiction over

10   challenges to denials of waivers of deportation, which is not at issue here.

11       **B. Demore, Jennings, and Carlson**

12       Petitioner asserts that his prolonged detention has become punitive and violates

13   substantive due process. (ECF No. 1 at 34.) In the motion to dismiss, Respondents argued that

14   "[t]he Supreme Court has repeatedly upheld detention pending removal proceedings, as in this

15   case, under § 1226(c)," citing to Demore v. Kim, 538 U.S. 510 (2003). (ECF No. 8 at 3.) This

16   Court rejected Respondents' arguments, found dismissal was not warranted, and "direct[ed]

17   Respondent to file an answer that more fully addresses the merits of Petitioner's substantive due

18   process claim." (ECF No. 15 at 13.) To the extent Respondents reassert their argument that

19   Petitioner is not entitled to habeas relief under Demore, (ECF No. 18 at 3–4), the Court finds

20   Respondents' argument unpersuasive as set forth in the prior order denying the motion to

21   dismiss. (See ECF No. 15 at 10–11.)

22       To the extent Respondents argue that Jennings v. Rodriguez precludes substantive due

23   process relief, (ECF No. 18 at 3), the Court finds such argument unpersuasive. Jennings held the

24   Ninth Circuit erred in finding a *statutory* right to *periodic* bond hearings and did not address any

25   constitutional arguments. See Jennings, 583 U.S. at 312 ("Because the Court of Appeals

26   erroneously concluded that periodic bond hearings are required under the immigration provisions

27   at issue here, it had no occasion to consider respondents' constitutional arguments on their

28   merits. Consistent with our role as 'a court of review, not of first view,' we do not reach those

1    arguments. Instead, we remand the case to the Court of Appeals to consider them in the first

2    instance." (citation omitted)).

3        Respondents also rely on <u>Carlson v. Landon</u>, 342 U.S. 524 (1952), to argue that "in

4    recognition that the government has significantly more latitude in detaining noncitizens, the

5    Supreme Court has consistently affirmed the constitutionality of detaining non-citizens for

6    removal proceedings." (ECF No. 18 at 4.) the Supreme Court described <u>Carlson</u> as "upholding

7    temporary detention of alien during deportation proceeding while noting that 'problem of . . .

8    unusual delay' was not present." <u>Zadvydas v. Davis</u>, 533 U.S. 678, 691 (2001) (citing <u>Carlson</u>,

9    342 U.S. at 545–46). In contrast, Petitioner has been detained for almost four and a half years.

10   **C. Applicable Test**

11       With regard to the substantive due process analysis and which test to apply, this Court

12   previously stated in pertinent part:

> "The Due Process Clause of the Fifth Amendment mandates that '[n]o person
> shall . . . be deprived of life, liberty, or property, without due process of law.'"
> <u>United States v. Quintero</u>, 995 F.3d 1044, 1051 (9th Cir. 2021) (quoting U.S.
> Const. amend. V). "The Due Process Clause 'protects individuals against two
> types of government action': violations of substantive due process and procedural
> due process." <u>Id.</u> (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987)).
> "[S]ubstantive due process prevents the government from engaging in conduct
> that shocks the conscience, or interferes with rights implicit in the concept of
> ordered liberty." <u>Salerno</u>, 481 U.S. at 746 (internal quotation marks and citations
> omitted). "When government action depriving a person of life, liberty, or property
> survives substantive due process scrutiny, it must still be implemented in a fair
> manner. This requirement has traditionally been referred to as 'procedural' due
> process." <u>Salerno</u>, 481 U.S. at 746 (citation omitted).
>
> In <u>Wong Wing v. United States</u>, 163 U.S. 228 (1896), the Supreme "Court held
> that punitive measures could not be imposed upon aliens ordered removed
> because 'all persons within the territory of the United States are entitled to the
> protection' of the Constitution." <u>Zadvydas</u>, 533 U.S. at 694 (quoting <u>Wong Wing</u>,
> 163 U.S. at 238). <u>See Zadvydas</u>, 533 U.S. at 694 (Kennedy, J., dissenting)
> ("Where detention is incident to removal, the detention cannot be justified as
> punishment nor can the confinement or its conditions be designed in order to
> punish." (citing <u>Wong Wing</u>, 163 U.S. 228)).
>
> "As an initial matter, the mere fact that a person is detained does not inexorably
> lead to the conclusion that the government has imposed punishment." <u>Salerno</u>,
> 481 U.S. at 746 (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 537 (1979)). However, "[i]t
> is undisputed that at some point, . . . detention can 'become excessively
> prolonged, and therefore punitive,' resulting in a due process violation." <u>United</u>
> <u>States v. Torres</u>, 995 F.3d 695, 708 (9th Cir. 2021) (quoting <u>Salerno</u>, 481 U.S. at
> 747 n.4). "The point at which detention constitutes a due process violation
> requires a case-by-case analysis." <u>Torres</u>, 995 F.3d at 708 (citing <u>United States v.</u>

Gelfuso, 838 F.2d 358, 359–60 (9th Cir. 1988)). "A due process violation occurs when detention becomes punitive rather than regulatory, meaning there is no regulatory purpose that can rationally be assigned to the detention or the detention appears excessive in relation to its regulatory purpose." Torres, 995 F.3d at 708 (citing Salerno, 481 U.S. at 747). "[W]hile the existence of some threshold of per se due process violation may be 'undisputed,' it has also never been clearly delineated in the context of immigration detention." Doe v. Becerra, 704 F. Supp. 3d 1006, 1020 (N.D. Cal. 2023) (citation omitted), abrogated on other grounds by Doe v. Garland, 109 F.4th 1188 (9th Cir. 2024).

. . .

. . . In the petition, Petitioner relies on a decision from the United States District Court for the Northern District of California that "defined the contours of substantive due process in a challenge to ICE detention." (ECF No. 1 at 17.) In Doe v. Becerra, 732 F. Supp. 3d 1071, the district court applied the following five factors, which drew "from Ninth Circuit cases regarding detention before criminal trial and civil commitment proceedings," to determine "whether continued detention under Section 1226(c) violates substantive due process":

> (1) the length of detention and whether it is excessive in relation to its regulatory purpose;
>
> (2) the government's contribution to any delay;
>
> (3) the evidence supporting the determination that detention is warranted to prevent flight risk or community danger;
>
> (4) whether the government interests in ensuring appearance at future proceedings and protecting the community could be protected through alternatives to detention that are less harsh; and
>
> (5) the conditions of detention and how they compare to conditions under which pretrial criminal detainees or people convicted of crimes are held.

Doe, 732 F. Supp. 3d at 1080 (citing Doe v. Becerra, 723 F. Supp. 3d 688, 692 (N.D. Cal. 2024)).

As argued by Respondent, (ECF No. 8 at 6), the Court acknowledges that a decision from the United States District Court for the Northern District of California is not binding on this Court. The Court further recognizes that in light of the Ninth Circuit's decision in Doe v. Garland, 109 F.4th 1188, the United States District Court for the Northern District of California lacked § 2241 jurisdiction in Doe v. Becerra, 732 F. Supp. 3d 1071. Nonetheless, this does not prevent the Court from considering Doe, 732 F. Supp. 3d 1071, as persuasive authority.

The Court notes, however, that it has not made a determination on whether the Doe five-factor test should be adopted in this matter.

(ECF No. 15 at 9–10, 13–14.)

///

Respondents contend that "reliance on *United States v. Salerno*, 481 U.S. 739, 755 (1987), and criminal cases analyzing substantive due process under the Bail Reform Act, is misplaced" because "such a criminal matter and decision has no application to civil detention in executive branch immigration court removal proceedings" where "the government has significantly more latitude in detaining non-citizens." (ECF No. 18 at 4.) Respondents argue that the Court "should not break new ground declaring the *Torres* factors[5] (from the criminal detention setting) as a new constitutional test in the immigration court setting because the Bail Reform Act is not analogous to detention under Section 1226(c)," citing to <u>Martinez Leiva v. Becerra</u>, No. 23-cv-02027-CRB, 2023 WL 3688097, at *5 (N.D. Cal. May 26, 2023), and <u>I.E.S. v. Becerra</u>, No. 23-cv-03783-BLF, 2023 WL 6317617, at *5.[6] (ECF No. 18 at 5 (footnote added).)

Petitioner asserts that "[m]ultiple courts, including the Supreme Court and Ninth Circuit, have found pretrial detention to be a fair comparison to civil immigration detention," citing to <u>Zadvydas v. Davis</u>, 533 U.S. 678, 690–91 (2001), and <u>Hernandez v. Sessions</u>, 872 F.3d 976, 993 (9th Cir. 2017). (ECF No. 19 at 4.) Petitioner argues that "[i]t thus falls in line with precedent to impose substantive limits on civil immigration detention by analogizing to well-established pretrial detention and civil commitment case law." (ECF No. 19 at 5.)

In <u>Hernandez v. Sessions</u>, the Ninth Circuit rejected the government's argument "that cases 'involv[ing] criminal detention' are irrelevant to immigration detention." 872 F.3d at 993 (alteration in original). The Ninth Circuit stated,

> On the contrary, the Supreme Court has recognized that criminal detention cases provide useful guidance in determining what process is due non-citizens in immigration detention. *See, e.g.*, *Zadvydas*, 533 U.S. at 690–91, 121 S.Ct. 2491. Furthermore, in

---

[5] In <u>United States v. Torres</u>, 995 F.3d 695 (9th Cir. 2021), the Ninth Circuit held that "in evaluating whether a [substantive] due process violation has occurred [in the criminal pretrial context], we weigh the following factors: (1) the length of the defendant's pretrial detention; (2) the prosecution's contribution to the delay; and (3) the evidence supporting detention under the Bail Reform Act." <u>Torres</u>, 995 F.3d at 708.

[6] Respondent claims that "[s]ince *Doe*, 732 F. Supp. 3d 1071, the NDCA has withdrawn from utilization of the *Torres* factors, including by repeatedly holding the *Torres* factors do not apply to substantive due process analysis in the immigration court context," citing to <u>Martinez Leiva</u> and <u>I.E.S.</u>. (ECF No. 18 at 2 n.2.) However, as noted by Petitioner, (ECF No. 19 at 4 n.2), <u>Martinez Leiva</u> and <u>I.E.S.</u> were decided before <u>Doe</u>.

> *M.L.B. v. S.L.J.*, the Supreme Court explicitly rejected a call to
> limit the effect of these principles "to cases typed 'criminal.' " 519
> U.S. 102, 127, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).
> Immigration cases, like the parental status termination cases at
> issue in *M.L.B.*, are set "apart from mine run civil actions" and
> "involve the awesome authority of the State" to take a
> "devastatingly adverse action"—here, the power to remove
> individuals from their homes, separate them from their families,
> and deport them to countries they may have last seen many years
> ago. *Compare M.L.B.*, 519 U.S. at 125, 127–28, 117 S.Ct. 555,
> *with Padilla v. Kentucky*, 559 U.S. 356, 365, 130 S.Ct. 1473, 176
> L.Ed.2d 284 (2010) ("We have long recognized that deportation is
> a particularly severe 'penalty' .... Although removal proceedings
> are civil in nature, deportation is nevertheless intimately related to
> the criminal process.") (citation omitted).

Hernandez, 872 F.3d at 993.

Additionally, Martinez Leiva and I.E.S. are distinguishable. In Martinez Leiva, the petitioner had been detained for twenty months, had never received a bond hearing, and brought both substantive and procedural due process claims. Martinez Leiva, 2023 WL 3688097, at *1. In denying the petitioner's substantive due process claim, the district court relied on the fact that the petitioner had not had a bond hearing. See id. at *5 ("Martinez Leiva's argument that his detention has become punitive because he does not pose a risk of flight or a danger—pointing to his family ties, the real possibility that he will succeed in his petition for review, and his rehabilitation—might be correct. But that is what bond hearings are for." (citation omitted)); id. ("The same is true of Martinez Leiva's argument that continued detention is excessive in relation to the government's interest, given alternatives like ICE's Intensive Supervision Appearance Program. It is correct only if he is correct that he poses no risk (or a manageable risk) of flight or danger, something that he has not yet had the opportunity to prove." (citation omitted)); id. ("The particularized point Martinez Leiva makes—that his time exposed to the conditions at Golden State Annex is excessive in light of less harsh alternatives that would provide adequate supervision for him—is one that he has not yet had the opportunity to demonstrate."). Although Martinez Leiva's reliance on Torres was rejected, it was rejected in part because Torres "actually concluded that the defendant's 21-month detention did not violate due process," which was longer than the petitioner's twenty-month detention. Id. at *6. Moreover, the court recognized that "[s]ubstantive due process prohibits civil detention that is punitive in its purpose or effect,

1  including detention that is unreasonably prolonged," citing to:  Jonas v. Blanas, 393 F.3d 918,

2  932 (9th Cir. 2004), which concerned a civil detainee awaiting proceedings under California's

3  Sexually Violent Predator Act ("SVPA"); Bell v. Wolfish, 441 U.S. 520, 536 (1979), which

4  concerned a criminal pretrial detainee; Jackson v. Indiana, 406 U.S. 715, 738 (1972), which

5  concerned pretrial commitment of incompetent criminal defendants; and United States v.

6  Salerno, 481 U.S. 739, 747 n.4 (1987), which concerned criminal pretrial detention. Martinez

7  Leiva, 2023 WL 3688097, at *5. Therefore, the Court finds that Martinez Leiva does not stand

8  for the proposition that cases involving civil commitment or pretrial criminal detention are

9  irrelevant to the substantive due process inquiry in the immigration detention context.

10         In I.E.S., the petitioner had been detained for sixteen months, had never received a bond

11  hearing, and brought both substantive and procedural due process claims. I.E.S., 2023 WL

12  6317617, at *1. I.E.S. found "Martinez Leiva v. Becerra instructive" and similarly relied on the

13  fact that the petitioner had not had a bond hearing to deny the substantive due process claim. See

14  id. at *7 ("Although I.E.S. might be correct that he does not pose a flight risk or danger to the

15  community, he has not yet had the opportunity to have a neutral arbitrator evaluate whether the

16  government could prove that he poses such a risk. Similarly, I.E.S.'s argument that his prolonged

17  detention is excessive in light of alternatives like the Intensive Supervision Appearance Program

18  ("ISAP") and the conditions at Golden State Annex is an argument that I.E.S. should have an

19  opportunity to prove at a bond hearing." (citation omitted)). Although I.E.S.'s reliance on Torres

20  was rejected, it was rejected in part because "the Ninth Circuit ultimately concluded that

21  detention for 21 months did not violate due process," which was longer than I.E.S.'s sixteen-

22  month detention. I.E.S., 2023 WL 6317617, at *7. Moreover, the court recognized that: (1)

23  "[s]ubstantive due process prohibits civil detention that is punitive in purpose or effect," citing to

24  Jones v. Blanas, 393 F.3d 918, which, as noted above, concerned a civil detainee awaiting

25  proceedings under California's SVPA; and (2) "[d]etention that is excessively or unreasonably

26  prolonged may be punitive," citing United States v. Salerno, 481 U.S. 739, which, as noted

27  above, concerned a criminal pretrial detainee and the Bail Reform Act.  I.E.S., 2023 WL

28  6317617, at *6. Thus, the Court also finds that I.E.S. does not stand for the proposition that cases

1  involving civil commitment or pretrial criminal detention are irrelevant to the substantive due

2  process inquiry in the immigration detention context.

3         The court in <u>Doe</u> rejected a similar argument from the government and found civil

4  commitment and criminal pretrial detention statutes analogous to § 1226(c):

5              Obviously the circumstances in this case do not involve detention
               before a criminal trial or a civil commitment proceeding. Mr. Doe
6              is not accused of a crime and awaiting a trial. He is detained under
               the Illegal Immigration Reform and Immigrant Responsibility Act
7              rather than the Bail Reform Act or a civil commitment statute.
               Still, these statutes are analogous and the constitutional principles
8              that limit them are similar. Like the Bail Reform Act, Section
               1226(c) limits mandatory detention to people accused or convicted
9              of certain serious crimes. Like the Bail Reform Act, Section
               1226(c) has twin aims of ensuring a potential detainee's
10             appearance at subsequent proceedings and ensuring public safety.
               And like the Bail Reform Act, Section 1226(c) has been upheld as
11             facially constitutional.

12  <u>Doe v. Becerra</u>, 723 F. Supp. 3d 688, 692 (N.D. Cal. 2024). The Court finds the above analysis

13  persuasive, and following <u>Zadvydas</u> and <u>Hernandez</u>, the Court finds that criminal detention and

14  civil commitment cases can provide useful guidance in the immigration detention context.

15         Respondents argue that the Court "should follow its own precedent rejecting utilization of

16  <i>Doe</i>, 732 F. Supp. 3d 1071, five factor analysis," citing to <u>Romero-Romero v. Wofford</u>, No.

17  1:24-cv-00944-SKO, 2025 WL 391861 (E.D. Cal. Feb. 4, 2025), <u>findings and recommendations</u>

18  <u>adopted</u>, 2025 WL 3154399 (E.D. Cal. Nov. 12, 2025). (ECF No. 18 at 5.) However, "[a]

19  decision of a federal district court judge is not binding precedent in either a different judicial

20  district, the same judicial district, or even upon the same judge in a different case." <u>Camreta v.</u>

21  <u>Greene</u>, 563 U.S. 692, 709 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice

22  § 134.02[1] [d], p. 134–26 (3d ed. 2011)). <u>Romero-Romero</u> is not binding in this matter. Further,

23  Respondents' reliance on <u>Romero-Romero</u> to argue that <u>Doe</u>'s five-factor test is "wrong" and

24  "unlawful to apply," is misplaced. <u>Romero-Romero</u> found that the court was "barred from

25  considering the third factor" based on the conclusion in <u>Martinez v. Clark</u>, 36 F.4th 1219 (9th

26  Cir. 2022), "that the IJ's 'determination of whether a particular noncitizen poses a danger to the

27  community is a discretionary determination, which a federal court may not review.'" <u>Romero-</u>

28  <u>Romero</u>, 2025 WL 391861 at *4 (quoting <u>Martinez</u>, 36 F.4th at 1228). However, the Supreme

1   Court vacated the judgment in <u>Martinez v. Clark</u>, 36 F.4th 1219, and remanded the matter in

2   light of <u>Wilkinson v. Garland</u>, 601 U.S. 209 (2024). <u>Martinez v. Clark</u>, 144 S. Ct. 1339 (2024).

3   On remand, the Ninth Circuit came to the opposite conclusion—"After *Wilkinson*, the

4   determination whether an alien is 'dangerous' for immigration-detention purposes is a mixed

5   question of law and fact and is reviewable as a 'question of law.'" <u>Martinez v. Clark</u>, 124 F.4th

6   775, 779 (9th Cir. 2024). <u>See</u> <u>Romero-Romero</u>, 2025 WL 3154399, at *2 n.2 (sustaining

7   objection that magistrate judge relied upon previously vacated decision in <u>Martinez v. Clark</u>, 36

8   F.4th 1219 (9th Cir. 2022)).

9       Respondents assert that "Petitioner has lawful remedies to challenge his continued

10  detention that do not require this court-of-custody to break new ground in (substantive due

11  process) constitutional law," noting that "Petitioner, *arguendo,* may attempt to improve his bond

12  chances by correcting or improving noted deficiencies and or Petitioner may have filed a motion

13  to enforce the underlying detention hearing order for supposed deficiencies." (ECF No. 18 at 7.)

14  "Thus, with lawful options to fight detention and, significantly, with looming foreseeable

15  resolution of deportation proceedings, it is factually inaccurate to conclude Petitioner is in civil

16  detention in violation of Fifth Amendment substantive due process safeguards." (<u>Id.</u>) However,

17  "the substantive component of the [Due Process] Clause . . . protects individual liberty against

18  'certain government actions regardless of the fairness of the procedures used to implement

19  them.'" <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 125 (1992) (quoting <u>Daniels v.</u>

20  <u>Williams</u>, 474 U.S. 327, 331 (1986)). And as noted by Petitioner, (ECF No. 19 at 6 n.4), the

21  Ninth Circuit in <u>Torres</u> did not consider the amount of process already received by Torres[7] and

22  the procedures available to him as precluding an inquiry into whether a substantive due process

23  violation had occurred.

24      As in <u>Doe</u>, "the government offers no alternative test other than a heads-I-win-tails-you-

25  lose approach that would simply conclude in all cases that mandatory detention under Section

26  1226(c) is constitutionally valid, no matter how long it lasts." 732 F. Supp. 3d at 1081. (<u>See</u> ECF

---

27  [7] Torres received a bail hearing, a detention review hearing before a magistrate judge, district court
28  review of the magistrate judge's ruling, reconsideration of the district court's denial, and district court
    review of a motion for release. <u>Torres</u>, 995 F.3d at 700–01.

No. 18 at 9 ("[S]o long as removal proceedings are continuing to progress, detention during those proceedings can never be excessive considering the government's interests as those interests are directly tied to the need to detain for those proceedings.").) Like the court in Doe, this Court rejects such a position and will adopt Doe's five-factor test, which considers:

> (1) the length of detention and whether it is excessive in relation to its regulatory purpose;
>
> (2) the government's contribution to any delay;
>
> (3) the evidence supporting the determination that detention is warranted to prevent flight risk or community danger;
>
> (4) whether the government interests in ensuring appearance at future proceedings and protecting the community could be protected through alternatives to detention that are less harsh; and
>
> (5) the conditions of detention and how they compare to conditions under which pretrial criminal detainees or people convicted of crimes are held.

Doe, 732 F. Supp. 3d at 1080 (quoting Doe, 723 F. Supp. 3d at 692).[8]

## D. Length of Detention

The Ninth Circuit has stated in the context of criminal pretrial detention, "It is undisputed that at some point, pretrial detention can 'become excessively prolonged, and therefore punitive,' resulting in a due process violation." United States v. Torres, 995 F.3d 695, 708 (9th Cir. 2021) (quoting Salerno, 481 U.S. 739, 747 n.4). Although the Ninth Circuit held Torres's twenty-one-month criminal pretrial detention due to the COVID-19 pandemic and suspension of jury selection and trials did not violate due process, the Ninth Circuit nevertheless "caution[ed] that the length of Torres's detention is approaching the limits of what due process can tolerate" and noted that "all parties agree that at some point, regardless of the risks associated with Torres's release, due process will require that he be released if not tried." Torres, 995 F.3d at 709, 710 (citing United States v. Briggs, 697 F.3d 98, 103 (2d Cir. 2012) ("There is no bright-line limit on

---

[8] As the Court previously noted in denying Respondents' motion to dismiss, (ECF No. 15 at 14), the Court acknowledges that a decision from the Northern District of California is not binding on this Court and recognizes that in light of the Ninth Circuit's decision in Doe v. Garland, 109 F.4th 1188, it appears that the United States District Court for the Northern District of California lacked § 2241 jurisdiction in Doe v. Becerra, 732 F. Supp. 3d 1071. Nonetheless, Doe v. Becerra, 732 F. Supp. 3d 1071, has not been vacated or overruled by the Ninth Circuit based on possible jurisdictional issues, and it does not prevent this Court from considering Doe, 732 F. Supp. 3d 1071, as persuasive authority.

1   the length of detention that applies in all circumstances; but for every of set of circumstances,

2   due process does impose some limit.")).

3           Here, Petitioner has been detained for almost four and a half years (fifty-four months),

4   more than double the twenty-one months the Ninth Circuit found to be "approaching the limits of

5   what due process can tolerate" in the criminal pretrial detention context. Torres, 995 F.3d at 709.

6   "[W]hile the existence of some threshold of per se due process violation may be 'undisputed,' it

7   has also never been clearly delineated in the context of immigration detention." Doe v. Becerra,

8   704 F. Supp. 3d 1006, 1020 (N.D. Cal. 2023) (quoting Torres, 995 F.3d at 708).

9               Ultimately, though, whether this prolonged detention is *excessive*
                and therefore punitive is a relative question. The duration of
10              detention itself must be weighed against two other considerations:
                First are the regulatory purposes for detention—preventing flight
11              risk and protecting public safety. Whether the duration of detention
                is excessive depends in part on the degree of those risks and the
12              extent to which Mr. Doe's detention mitigates them. Second are
                the conditions of detention. Because not all forms of detention are
13              equivalent, whether the duration is excessive relative to its
                purposes also depends in part on how harsh the conditions are.
14

15  Doe, 732 F. Supp. 3d at 1083.

16          **E.  Government Delay**

17          "The second factor is closely related to the first factor and addresses the reasons for any

18  delays that have contributed to the duration of detention." Doe, 732 F. Supp. 3d at 1083. The

19  NTA ordered Petitioner to appear before an IJ on June 22, 2021. (ECF No. 1-3.) The IJ issued

20  the order denying Petitioner's applications for relief on September 7, 2022, more than fourteen

21  months after Petitioner was initially ordered to appear. There is nothing before this Court to

22  indicate when Petitioner filed his applications for relief and whether there were any delays, and

23  the cause of those delays, that contributed to the IJ issuing a decision more than one year after

24  Petitioner was initially ordered to appear in immigration court. Approximately five months

25  elapsed before the BIA affirmed the IJ's decision on February 14, 2023. Again, there is nothing

26  before this Court to indicate whether there were any delays, and the cause of those delays, during

27  the BIA appeal.

28  ///

1    On February 22, 2023, Petitioner filed a petition for review in the Ninth Circuit. Petition

2   for Review, <u>L.M. v. Bondi</u>, No. 23-241 (9th Cir. Feb. 22, 2023), ECF No. 1.[9] On February 23,

3   2023, a briefing schedule was issued that ordered Petitioner's opening brief due on May 30,

4   2023. <u>Id.</u>, ECF No. 6. Petitioner was granted two extensions of time to file his opening brief and

5   one extension to file his reply brief. <u>Id.</u>, ECF Nos. 18, 19, 20, 21, 31, 32. The government was

6   granted one extension of time to file its answering brief. <u>Id.</u>, ECF Nos. 25, 26. Briefing was

7   completed on December 20, 2023. <u>Id.</u>, ECF No. 36. On April 3, 2024, the matter was argued and

8   submitted. <u>Id.</u>, ECF No. 50. On April 19, 2024, the Ninth Circuit issued its memorandum

9   disposition dismissing in part and granting in part the petition for review and remanding the

10  matter, and the mandate issued on June 11, 2024. <u>Id.</u>, ECF Nos. 51, 52.

11   On January 8, 2025, almost seven months after the Ninth Circuit mandate issued, the BIA

12  remanded to the immigration court for further proceedings given "further fact-finding will be

13  necessary," both parties' requests for remand,[10] and the Ninth Circuit's decision. (ECF No. 18-1

14  at 36.) There is nothing before this Court to indicate whether there were any delays, and the

15  cause of such delays, during the BIA proceedings on remand.

16   Following the BIA's remand to the immigration court, Petitioner's immigration counsel

17  appeared at a master calendar hearing on March 6, 2025. The IJ set a new hearing date for April

18  29, 2025, which counsel understood would be an individual (evidentiary) hearing and thus, took

19  two additional declarations. (ECF No. 19-2 at 2.) However, the case was taken off calendar and

20  the IJ issued a denial order without further evidence. Petitioner has appealed the decision to the

21  BIA.  (<u>Id.</u> at 2–3.)

22   Various delays in Petitioner's immigration proceedings have contributed to the duration

23  of Petitioner's detention. As set forth above, based on the record before the Court, the delays are

24  ───────────────

25  [9] The Court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." <u>U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.</u>, 971 F.2d 244, 248 (9th Cir. 1992) (internal quotation marks and citation omitted)). <u>See also</u> <u>United States v. Raygoza-Garcia</u>, 902 F.3d 994, 1001 (9th Cir. 2018) ("A court may

26  take judicial notice of undisputed matters of public record, which may include court records available through PACER."); <u>Reyn's Pasta Bella, LLC v. Visa USA, Inc.</u>, 442 F.3d 741, 746 n.6 (9th Cir. 2006)

27  ("We may take judicial notice of court filings and other matters of public record.").

28  [10] Petitioner "requested either a grant of deferral of removal or a remand to the Immigration Judge." (ECF No. 18-1 at 36.)

1  attributable to Petitioner, the government, and the fact that proceedings and decisions in

2  immigration court, the BIA, and the Ninth Circuit take time.

3      **F.  Flight Risk and Dangerousness**

4      Petitioner contends that his "2010 conviction does not evince *current* danger," noting

5  during his "year-plus out of custody, [he] had impeccable conduct. He found steady employment,

6  supported his family, and adjusted well according to his parole officer. He participated in weekly

7  sex offender treatment, submitted to drug tests, and complied with all the terms of his parole."

8  (ECF No. 1 at 29.) During his time in immigration detention, Petitioner has completed the

9  limited courses offered on tablets, maintained a close connection with his family, and has been

10  commended by Tonya Andrews, then-Assistant Facility Administrator at GSA, for his

11  "exemplary behavior" and being a "positive role model." (Pet'r Ex. G at 22.) Petitioner has

12  submitted a risk assessment conducted by a recognized expert in forensic psychology that

13  concluded Petitioner is "in the lowest risk category" and "poses no risk to any child or to any

14  other member of the community with regard to sexual offending or any other criminal actions."

15  (Id. at 35.)

16      Respondent's argument that Petitioner may pose a danger to the community relies on the

17  IJ's determination, which in turn was based on Petitioner's past criminal convictions, Petitioner's

18  declaration minimizing the severity of the offense, insufficient evidence of Petitioner's

19  rehabilitative efforts, and Dr. Williams's expert report, which the IJ gave limited weight. This

20  Court is not bound by the IJ's determinations, see Doe, 732 F. Supp. 3d at 1086–87, and this

21  Court is not reviewing the IJ's determinations under the abuse of discretion standard, see

22  Martinez, 124 F.4th at 784. Rather, this Court is making an independent assessment of

23  Petitioner's dangerousness and flight risk in the context of Petitioner's substantive due process

24  claim. However, given that Respondent relies on the IJ's bond denial order and does not provide

25  separate arguments regarding Petitioner's dangerousness and flight risk, (ECF No. 18 at 8–11),

26  the Court will address the IJ's determinations.

27  ///

28  ///

The IJ's decision denying bond states in pertinent part:

**A. Danger**

In the present matter, the Court first analyzed whether the Department demonstrated, by clear and convincing evidence, that [Petitioner]'s release "would present a danger to the community." *See Matter of Urena,* 25 I&N Dec. 140, 141 (BIA 2009). To conduct this analysis, the Court considered the recency, extent, and seriousness of his criminal record. *Singh v. Holder,* 638 F.3d 1196, 1206 (9th Cir. 2011).

    1. [Petitioner]'s Criminal Record

On January 20, 2011, [Petitioner] was convicted of child endangerment, in violation of California Penal Code (CPC) section 273a(a), and two counts for committing a lewd or lascivious act upon a child under fourteen, in violation of CPC section 288(a). Exh. 3 at 33. [Petitioner] was sentenced to a total of eleven years and four months for these offenses. *Id.* A conviction under CPC section 288(a) is a categorical crime of sexual abuse of a minor and a per se aggravated felony. *See United States v. Baron-Medina.,* 187 F.3d 1144, 1147 (9th Cir. 1999) (holding, in the context of the Federal Sentencing Guidelines, that a conviction under CPC section 288(a) was an aggravated felony because it constituted "sexual abuse of a minor" within the meaning of INA section 101(a)(43)(A)); *see also Mendoza-Garcia v. Garland,* 36 F.4th 989, 998 (9th Cir. 2022) (explaining that a noncitizen convicted of an aggravated felony and sentenced to at least five years' imprisonment is "deemed 'a danger to the community of the United States'" (quoting INA§ 241(b)(3)(B)(ii))). This conviction is sufficiently recent and severe to evince dangerousness to children. *See Pablo v. INS,* 72 F.3d 110, 114 (9th Cir. 1995) ("Sexual offenses perpetrated on children are exceptionally serious crimes."); *Matter of N-A-M-,* 24 I&N Dec. 336, 343 (BIA 2007) ("Crimes against persons are more likely to be categorized as particularly serious."); *see also Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002) ("sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people"); *United States v. Rocha-Alvarado,* 843 F.3d 802, 808 (9th Cir. 2016) (holding that "sexual contact with a child below the age of fourteen is *per se* abusive"); *Matter of Jimenez-Cedillo,* 27 I&N Dec. 782, 785 (BIA 2020) (acknowledging the physical, psychological, and societal harms stemming from sexual activity with a child); *Matter of Olquin,* 23 I&N Dec. 896, 897 (BIA 2006) ("Sexual exploitation of children is a particularly pernicious evil. It is evident beyond all doubt that any type of sexual conduct involving a child constitutes an intrusion upon the rights of that child, whether or not the child consents.").

The underlying circumstances and facts of [Petitioner]'s convictions are particularly egregious. [Petitioner]'s victim was his three-year-old niece, who belongs to a vulnerable class within society. Exh. 2 at 15, 280-281; *see also Matter of Sanudo,* 23 I&N Dec. 968, 971-72 (BIA 2006) (noting that "the infliction of bodily harm upon a person whom society views as deserving of special protection, such as a child ... reflects a degenerate willingness on the part of the offender to prey on the vulnerable or to disregard his social duty to those who are entitled to his care and protection"). [Petitioner] also was babysitting the victim when the incident occurred, and rather than caring for this child, he wantonly abused his position of trust. Exh. 2 at 280-281. Additionally, [Petitioner] inflicted substantial bodily injury upon the victim. The victim was taken to the hospital as the result of her injuries, which included bleeding and several abrasions in and around the victim's genital area and anus. Exh. 2 at 155;

Exh. 3 at 42, 59. The record also shows the victim was hospitalized for approximately one week following this incident, which further indicates the violent nature of [Petitioner]'s crime. *See* Exh. 3 at 41, 69 (reporting the victim's emergency room examination on June 29); *id.* at 55 (stating the victim was admitted to the hospital); *id.* at 69 (noting the victim's hospital discharge on July 6). [Petitioner] also displayed a callous disregard for the physical well-being of the victim after the incident, which is an extremely aggravating factor in this case. [Petitioner] knew the victim's injury was serious. Exh. 2 at 281. He knew that she was bleeding from her private area. *Id.* at 15. He noticed that the victim had left blood stains on the bed blankets and had blood on her underwear. *Id.* at 134. Instead of seeking medical help for the victim, he attempted to cover up his crime. He cleaned the victim's clothes, flushed her underwear down the toilet, and tried to clean up the blood. *Id.* at 15, 134. Moreover, he did not tell her parents what happened. *Id.* at 15. The Court found that the facts underlying [Petitioner]'s convictions, which involved his cruel victimization of a vulnerable class and abuse of power, supports the conclusion that his release would "present a danger to the community." *Matter of Urena,* 25 I&N Dec. at 141 (BIA 2009).

Finally, the Court found [Petitioner]'s lengthy prison sentence "underscores the seriousness of his offense." *Matter of T-C-A-,* 28 I&N Dec. 472, 481 (BIA 2022). Notably, [Petitioner] was sentenced to eight years for one of his CPC section 288(a) convictions, which is the upper term provided for such violations. Exh. 3 at 33. He was sentenced to the middle term of 2 years for the other CPC section 288(a) conviction, and to the middle term of 16 months for his CPC section 273a(a) conviction, giving him a total sentence of 11 years and 4 months. *Id.* This substantial total sentence further underscores the gravity of his offenses. *Id.; see also Matter of L-S-,* 22 I&N Dec. 645,655 (BIA 1999) (en banc) (considering the "length of imprisonment to be significant and indicative of the seriousness" of a crime); *Matter of R-A-M-,* 25 I&N Dec. 657, 662 (BIA 2012) (characterizing respondent's 280 days in prison as "not a light sentence" even though it was less than the statutory maximum allowed for a child pornography conviction, and noting such crimes "victimize[] some of the most vulnerable members of society").

Despite being convicted of two counts of committing a lewd or lascivious act upon a child under fourteen, in violation of CPC section 288(a), [Petitioner] denies sexually abusing the victim or having a sexual intent. Exh. 2 at 15-16. He claims that he was playing with the victim when he became blinded by the pain of being sexually assaulted by the victim's father and yanked the victim's underwear with such force that he caused the victim's injuries. Exh. 2 at 13, 15, 129, 147. The Court cannot look behind the conviction and accepts the fact of conviction as noted in the conviction documents. Exh. 3 at 15-39; *See Sinotes-Cruz v. Gonzales,* 468 F.3d 1190 (9th Cir. 2006). Moreover, the record shows [Petitioner] pled no contest to lewd and lascivious acts with a child under CPC section 288(a). Ex. 3 at 36. His version of the events underlying his conviction are irreconcilable with the criminal behavior prohibited by his statute of conviction. *See* CPC § 288(a) (prohibiting only acts committed "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child"). However, even taking [Petitioner]'s statements at face value, the Court would still find that [Petitioner] posed a danger to the community if released. In a moment of anger, Respondent lost control and violently attacked the victim, causing severe bodily injuries. Moreover, as stated before, [Petitioner] displayed a callous disregard towards the victim's physical wellbeing. Instead of getting her necessary medical attention, he attempted to cover up his crime so he would not get in trouble. Thus, [Petitioner]'s narrative does not change the character of his

serious, dangerous, and callous actions. Accordingly, the Court found [Petitioner]'s criminal history provided strong evidence that his release would pose a danger to the community. *See Matter of Urena,* 25 I&N Dec. at 140-141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

2. Mitigating Evidence

"Dangerousness is a 'fact-intensive' inquiry that requires the 'equities be weighed.'" *Martinez v. Clark*, 36 F.4th 1219, 1229 (9th Cir. 2022) (quoting *Torres-Valdivias v. Lynch,* 786 F.3d 1147, 1153 (9th Cir. 2015)) (analyzing challenges to a denied bond request where a district court ordered "the government to show [respondent posed a danger or flight risk] by clear and convincing evidence"; an IJ considered his "mitigating evidence"-such as his pre-incarceration release, "efforts at rehabilitation," family ties, and community support but found the government's burden satisfied in light of his "dispositive" drug trafficking convictions; and the Board "properly noted" the government's burden and agreeing respondent "was ineligible for release on bond based on the 'totality of the evidence'"). Here, the Court found insufficient mitigating evidence to overcome the seriousness of [Petitioner]'s criminal history. Although [Petitioner] submitted proof of completing courses of professional development and self-improvement, his masonry classes were completed in 2016-2017, while he was in state prison, and his self-improvement classes were completed from March to June 2023, while he was in the Department's custody. Exh. 2 at 160-170, 225-271. Moreover, these courses are not facially specific to sexual impropriety. *Id.* While [Petitioner]'s efforts are commendable, such rehabilitative efforts within the confines and structure of prison failed to persuade the Court that [Petitioner] has been sufficiently rehabilitated so as to sufficiently diminish the risk of danger to the community. *See Matter of C-A-S-D-,* I&N Dec 692, 700 (BIA 2019) (affording diminished weight to rehabilitation efforts in prison); *Matter of Mendez,* 21 I&N Dec. 296, 304 (BIA 1996) (finding that "good conduct in following prison rules in a controlled setting [is not] persuasive evidence of rehabilitation").

[Petitioner] also attended individual and group therapy classes at Hope Program from March 2020, after he was released from prison, until May 2021, before he was detained by the Department. Exh. 2 at 17-18. [Petitioner] attended classes twice a week, which. Included sex offender treatment classes. *Id.* at 17. However, [Petitioner]'s declaration undermines his attempts to demonstrate rehabilitation. Rather than accepting responsibility for the incident underlying his convictions, [Petitioner] attempted to minimize his conduct. He denied sexually abusing the victim or having a sexual intent. *Id.* at 15-16. He claimed that he was playing with the victim when he became blinded by the pain of being sexually assaulted by the victim's father and yanked the victim's underwear with such force that he caused the victim's injuries. *Id.* at 13, 15; *see also Matter of German Santos,* 28 I&N Dec. 552, 561 (BIA 2022) ("The Immigration Judge permissibly construed the Respondent's minimization of his responsibility for the accident as evidence of a lack of rehabilitation and failure to accept responsibility for his conduct."). The Court also found it unlikely that [Petitioner]'s description of his actions would result in imprisonment for more than a decade. Exh. 3 at 33; *see also Matter of M-H-,* 26 I&N Dec. 46, 50-51 (BIA 2012) (recognizing that the Court may discredit a respondent's testimony regarding the events underlying a conviction where such testimony is inconsistent with the elements of the offense). The Court was not persuaded that [Petitioner]'s statements minimizing the severity of the offense demonstrate genuine remorse and sufficient rehabilitation.

20

1

2 [Petitioner] also presented testimony from a psychologist, Dr. Martin Williams, who conducted a "sexual recidivism risk" evaluation of Respondent and compiled

3 a report based on the administration of three tests: the Minnesota Multiphasic Personality Inventory, 2nd Revision, Restructured Format (MMPI-2RF), *see* Exh.

4 2 at 42; the Static-99R, *see id.* at 44; and the Hare Psychopathy Checklist (PCL-R), *see id.* at 45. However, there are limitations to Dr. Williams's report. For

5 instance, Dr. Williams ultimately concluded that [Petitioner] has a 0.55% chance of reoffending. *See* Exh. 2 at 44-45. Dr. Williams testified that this score "means

6 that 1 in 200 people who I say are safe are actually going to offend." Thus, while [Petitioner]'s Static-99R score places him in the lowest risk category, this record

7 does not show that he poses *no* risk of danger to the community. Furthermore, "'safe' is not the equivalent of 'risk-free.'" *Indus. Union Dep't, AFL-CIO v. Am.*

8 *Petroleum Inst.,* 448 U.S. 607, 642 (1980); *see also id.* at 655 (stating that "[s]ome risks are plainly acceptable and others are plainly unacceptable," and

9 explaining that odds of "one in a billion ... clearly could not be considered significant," but that a reasonable person might consider a risk of "one in a

10 thousand" to be "significant").

11 Moreover, the STATIC-99R does not look at anything except its set of known predictors, which are listed on pages 44-45 of Exhibit 2. *See also United States v.*

12 *Farley,* 607 F.3d 1294, 1322 (11th Cir. 2010) (noting that the coding manual for the Static-99 assessment includes a disclaimer of "only 'moderate predictive

13 accuracy' and [does] not incorporate all the factors that might be relevant to a 'wide-ranging risk assessment'"). According to Dr. Williams, this test does not

14 consider additional factors such as sexually deviant interests, or subjective factors to include whether the individual has shown remorse or accepted responsibility

15 for his actions. *See also United States v. McIlrath,* 512 F.3d 421, 425 (7th Cir. 2008) (discussing limitations of Static-99, including inaccurately low estimates

16 "when one is dealing with underreported crimes such as sex offenses," and noting the test "may be a good place to start an analysis of the likelihood of a specific

17 defendant's repeating his crime-but not to end it"). Dr. Williams also admitted that while he evaluated [Petitioner] for pedophilia under the current criteria set

18 forth in the DSM-5-and concluded that [Petitioner] is not a pedophile- there is "no valid scientific test" to identify pedophilia.

19 Furthermore, Dr. Williams also explained an offender's Static-99R score is divided in half for every five years without reoffending, and that [Petitioner]'s

20 score was twice divided in half since he did not reoffend during his incarceration for more than a decade. Notably, however, [Petitioner]'s victim was a three-year-

21 old girl. Dr. Williams testified that paraphilias include "nonexclusive" and "exclusive" offenders, the latter of which prey only on children and thus would

22 not have opportunities to reoffend while incarcerated, but who do so after their release. While this record does not show that [Petitioner] reoffended during the 15

23 months between his release on parole and his immigration detention, the Court does not find the absence of reoffending during this period to be persuasive. The

24 victim of [Petitioner]'s crime was his niece, for whom he provided unsupervised childcare. In contrast, the record shows that [Petitioner]'s release coincided with

25 the beginning of the Covid-19 pandemic and attendant lock-down measures, and that he subsequently resided with his wife and teenage son, *see* Exh. 2 at 22, ¶ 1;

26 *id.* at 27, ¶ 1, and worked in "general labor" as a forklift driver before "moving to shipping and receiving," *see id.* at 24, ¶ 9. Moreover, [Petitioner]'s behavior was

27 subject to close scrutiny pursuant to the terms of his supervised release. *See id.* at 161-67. In sum, this record does not support the conclusion that [Petitioner] had

28 similar, unsupervised access to children after his incarceration such that the lack

of reoffending is substantially indicative of his danger to the community. Given the abovementioned limitations of the Static-99R, the Court finds its recidivism score holds limited probative value in the broader context of a dangerousness determination, and affords limited weight to that portion of Dr. Williams' report. *See also Matter of M-A-M-Z-,* 28 I&N Dec. at 177 ("Immigration Judges must consider whether evidence is probative and fundamentally fair when deciding whether to admit evidence. But the question whether to rely on specific portions of the expert witness testimony for making a factual finding is different . . . The question of what probative value or weight to give to expert evidence is a determination for the Immigration Judge to make as the fact finder.").

Dr. Williams also opined that [Petitioner]would pose a low risk of committing a violent nonsexual offense. He explained that the remaining tests- the MMPI-2RF, which tests for psychological problems, and the PCL-R, which tests for psychopathy-did not reveal the presence of factors associated with loss of impulse control, and that [Petitioner]'s prison record did not include fights or write-ups. Moreover, Dr. Williams testified that where an individual is not a psychopath and committed a crime out of anger, another violent crime is "not something [recidivism evaluators] worry about recurring." Importantly, however, [Petitioner]'s FBI rap sheet shows he was charged with "battery by prisoner" in 2018. Ex. 3 at 12–13. Thus, the record does not contain a complete absence of violent criminality during [Petitioner]'s incarceration such that the Court is persuaded that he poses no danger of committing a violent crime in the future. Therefore, the Court affords limited weight to Dr. Williams' opinion regarding the likelihood of [Petitioner]'s commission of a violent nonsexual crime. *See also Velasquez-Samayoa. v. Garland,* 49 F.4th 1149, 1157 (9th Cir. 2022) (noting that in the context of an expert witness, the Court "may reject credible testimony if it is contradicted or 'outweighed by other more persuasive evidence'" (quoting *Garland v. Ming Dai,* 593 U.S. 357, 372 (2021))).

For these reasons, the Court afforded limited weight to Dr. Williams's report. *See Matter of D-R-,* 25 I&N Dec. 445, 455 (BIA 2011) (the Court is not required to accept the assertions of a party, "even if plausible, where there are other permissible views of the evidence based on the record"); *see also Kansas v. Crane,* 534 U.S. 407, 413 (2002) ("the science of psychiatry ... informs but does not control ultimate legal determination"); *Market St. Ry. Co. v. Railroad Commission of State of California,* 324 U.S. 548, 560 (1945) (experts' judgments would not bind, but would be weighed according to the estimate of the reasonableness of their conclusions and force of their reasoning); *Western Canada S. S. Co. v. United States,* 245 F.2d 921, 925 (9th Cir. 1957) ("An expert opinion is never binding upon the trier of fact") ; *Matter of Caron International, Inc.,* 19 I&N Dec. 791, 795 (Comm. 1988) (if expert opinion is not in accord with other information or is in any way questionable, the Court is not required to accept or may give less weight to that evidence).

### 3. Conclusion

In sum, the Court found the mitigating factors discussed above were insufficient to outweigh "strong evidence of [Petitioner]'s dangerousness." *Martinez,* 36 F.4th at 1231. Moreover, [Petitioner]'s claims of rehabilitation were further undermined by his limited remorse, minimization of his actions, and refusal to accept full responsibility for actions. Accordingly, given all the foregoing, the Court found the Department met its burden to demonstrate, by clear and convincing evidence, that [Petitioner]'s release would "present a danger to the community." *Matter of Urena.,* 25 I&N Dec. at 141.

1

2

**B. Flight**

3

Given the finding of danger to the community, the Court did not need to reach the issue of flight. *Matter of Garcia Arreola,* 25 I&N Dec. at 272 (noting that only where a detainee's release "would not pose a danger to property or persons should an Immigration Judge decide the amount of bond necessary to ensure [his] presence at proceedings to remove him from the United States" (citing *Matter of Urena,* 25 I&N Dec. 140)). However, even if [Petitioner] did not pose a danger to the community, the Court determined that [Petitioner]'s release would present an unacceptable flight risk that could not be mitigated with any bond amount. *See Matter of Siniauskas,* 27 I&N Dec. 207, 209 (BIA 2018) (listing factors that are "proper considerations in deciding whether [a respondent] is a flight risk," including "family ties and his possible eligibility for discretionary relief," as well as whether he has "a fixed address, a residence of long duration, a history of employment, and other community ties"). The Court first considered relevant factors that elevate his risk of flight. [Petitioner]'s convictions make him ineligible for most relief except for deferral of removal under the Convention Against Torture, which imposes upon [Petitioner] a high standard of proof, and adjustment of status under section 245(a) of the Act with a waiver under section 212(h) of the Act, in which he would be subject to the heightened standard of discretion. These limited avenues of relief from removal significantly increase his risk of flight. Moreover, the Court denied [Petitioner]'s applications for deferral of removal under the Convention Against Torture, waiver under section 212(h) of the Act and adjustment of status under 245(a) of the Act and ordered [Petitioner] removed to Mexico. Exh. 2 at 296. The Board affirmed the Court's decision without opinion. *Id.* at 299. While [Petitioner] has a petition for review pending with the Ninth Circuit Court of Appeals, he currently is not eligible for any other forms of relief and has a final order of removal which increases his risk of flight exponentially. *See generally* Exh. 2 at 300-361; *see also Matter of R-A-V-P-,* 27 I&N Dec. at 805 (stating "the likelihood that relief from removal would be granted" may be considered in bond proceedings). "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade,* 19 I&N Dec. 488, 490 (BIA 1988). Finally, as discussed above, there is insufficient evidence of [Petitioner]'s rehabilitation, which further decreases the likelihood of his compliance with any terms of release. Thus, the Court concluded that the above-mentioned factors contributed to [Petitioner]'s risk of flight.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

The Court also considered relevant factors that mitigate [Petitioner]'s risk of flight. [Petitioner] has lived within the United States since March 1995, when he was seven years old. Exh. 2 at 12. He adjusted status to that of a lawful permanent resident on July 26, 2000. *Id.* at 103. [Petitioner] submitted voluminous letters of support from family, friends, community members, and organizations, showing his ties to the community. *Id.* at 22-32, 77-100. He submitted documents showing his education and employment history in the United States, as well as his former employer's willingness to rehire [Petitioner] if he is released from custody. *Id.* at 83, 107. [Petitioner] also has a United States citizen wife and son. *Id.* at 109-110. Nevertheless, these positive factors were insufficient to mitigate [Petitioner]'s high risk of flight. Given the foregoing, the Court found that the evidence, considered as a whole, showed that [Petitioner] poses such a high flight risk that no amount of bond or combination of conditions could mitigate that risk. *See Matter of Guerra,* 24 I&N Dec. at 40 (allowing the Court to give varying weight to the factors present in each case so long as the decision is reasonable).

22

23

24

25

26

27

28

1

2
3

> In conclusion, the Court therefore found that the Department had met its burden of establishing, by clear and convincing evidence, that [Petitioner]'s ongoing detention was justified because his release would pose a danger to the community and a significant risk of flight.

4    (ECF No. 18-1 at 19–25.)

5    Petitioner's convictions for lewd acts upon a child and child endangerment are

6    exceptionally serious and particularly egregious. "The question here, though, is how strongly

7    these past convictions evince *current* danger." Doe, 732 F. Supp. 3d at 1087. The IJ found

8    Petitioner's 2011 convictions "sufficiently recent and severe to evince dangerousness to

9    children," the facts underlying Petitioner's convictions "support[] the conclusion that his release

10   would 'present a danger to the community,'" and Petitioner's "lengthy prison sentence

11   'underscores the seriousness of his offense.'" (ECF No. 18-1 at 19, 20 (citations omitted).)

12   However, "decades-old criminal conduct is relevant but not dispositive in evaluating present

13   danger, and there are serious due process concerns with simply presuming someone remains

14   dangerous based on past conduct without individualized consideration and *any recent evidence*."

15   Doe, 732 F. Supp. 3d at 1087 (emphasis added).

16   Petitioner submitted a risk assessment conducted by Dr. Martin H. Williams, a

17   recognized expert in forensic psychology. (Pet'r Ex. G at 28–36.) Dr. Williams also testified at

18   Petitioner's bond hearing before the IJ. (Pet'r Ex. I, ECF No. 1-11.) Dr. Williams administered

19   the Static-99R test, which is described by its publisher as "a ten item actuarial assessment

20   instrument created . . . for use with adult male sexual offenders who are at least 18 year of age at

21   time of release to the community" and "the most widely used sex offender risk assessment

22   instrument in the world" with extensive use in the United States. (Pet'r Ex. G at 34.) For

23   example, the California Department of Corrections and Rehabilitation ("CDCR") uses the Static-

24   99 as "a mandatory risk assessment tool for any lifeterm inmate who [i]s eligible for parole and

25   who ha[s] a history of a sexual offense." (Id.) See Cal. Pen. Code § 290.04 (mandating use of

26   Static-99 test for adult male sex offenders). "The Static-99R was developed by conducting a

27   metanalysis of hundreds of studies involving over 90,000 sex offenders released from prison"

28   and "makes actuarial predictions. Just as obesity, cigarette smoking and poor diet might predict

24

1  the risk of heart attack, the Static-99R predicts sexual reoffending based on known actuarial risk

2  factors." (Pet'r Ex. G at 34.) The Static-99R measure is calculated based on "objective, static

3  factors" and "in no way relies on the credibility of the examinee to produce accurate results."

4  (Pet'r Ex. G at 34.)

5      Dr. Williams evaluated Petitioner on the assumption that despite Petitioner's denials,

6  Petitioner's offenses involved sexual intent. Dr. Williams found Petitioner "did not present with

7  the following historical factors that contribute to increased risk of reoffending": never married or

8  lived in an equivalent relationship, prior sex offenses, prior sentencing dates, prior non-contact

9  sex offenses (e.g., voyeurism or exhibitionism), stranger victims (current or prior), male victims

10 (current or prior), unrelated victims, and young adult current age of offender being evaluated.

11 (Pet'r Ex. G at 34–35.) Petitioner "attained a score of 0 on the Static-99R," which placed

12 Petitioner "in the lowest risk category." (Id. at 35.) "The predicted five year recidivism rate

13 (calculated from the time the measure is administered) for this score is 2.2%."[11] (Id.) Dr.

14 Williams concluded that "[f]or all practical purposes, [Petitioner] poses no risk to any child or to

15 any other member of the community with regard to sexual offending or any other criminal

16 actions." (Pet'r Ex. G at 35.)

17     The IJ found Dr. Williams's "recidivism score holds limited probative value in the

18 broader context of a dangerousness determination, and affords limited weight to that portion of

19 Dr. Williams' report" because: (1) the Static-99R "test does not consider additional factors such

20 as sexually deviant interests, or subjective factors to include whether the individual has shown

21 remorse or accepted responsibility for his actions"; (2) Petitioner's "score was twice divided in

22 half since he did not reoffend during his incarceration for more than a decade" but he "would not

23 have opportunities to reoffend while incarcerated"; and (3) Petitioner's release from prison

24 "coincided with the beginning of the Covid-19 pandemic and attendant lock-down measures"

---

[11] Although the STATIC-99R Manual "advises that for each five years that elapses from the original offense without reoffending, the calculated risk of offending should be divided in half," which meant in Petitioner's case his "calculated risk of 2.2% should be divided in half at least twice" leading "to a new calculated risk of reoffending of 0.55% in within five years," (Pet'r Ex. G at 35), it should be noted that this does not take into account that Petitioner was in prison during those five-year increments and would not have had an opportunity to reoffend (i.e., commit lewd acts upon a child), (Pet'r Ex. I at 12–13).

1  and his "behavior was subject to close scrutiny pursuant to the terms of his supervised release"

2  such that Petitioner's "lack of reoffending is [not] substantially indicative of his danger to the

3  community." (ECF No. 18-1 at 22, 23.)

4          Although the Static-99R test does not consider sexually deviant interests, Dr. Williams

5  testified that testing someone for pedophilic disorder is "difficult to do. There is no valid

6  scientific test for that disorder that is applicable if the person wants to conceal it. So the only test

7  that's along those lines is the Static-99. If [Petitioner] were a pedophile, you would expect higher

8  scores on the Static-99." (Pet'r Ex. I at 19.) Dr. Williams evaluated Petitioner "under the current

9  criteria and the DSM-5[12] for [pedophilic] disorder" and concluded that Petitioner is "not a

10 pedophile." (Pet'r Ex. I at 19.) (See also Pet'r Ex. G at 33 (concluding that Petitioner "does not

11 meet the criteria for pedophilic disorder, and there is no indication that he has ever met Criterion

12 A[13] for that disorder").) Dr. Williams testified that one limitation to the Static-99R test "is that it

13 gives zero credit for any rehabilitation that the person may have done." (Pet'r Ex. I at 14.) "So

14 some people feel that the Static-99 is unfair because it does not give the person credit for any

15 rehabilitation and holds them accountable just for their known history. So it's been criticized as

16 basically being too harsh." (Id.) Nonethless, Dr. Williams testified that in his opinion, the Static-

17 99R test is a comprehensive risk assessment for sexual offenses, "the gold standard," and "the

18 most widely used measure." (Id. at 15.)

19         Without twice dividing Petitioner's score based on lack of reoffending while Petitioner

20 was incarcerated, the ""predicted five year recidivism rate (calculated from the time the measure

21 is administered) for this score is 2.2%." (Pet'r Ex. G at 35.) "In other words, two or so

22 individuals out of every hundred with this score will reoffend within five years[.]" (Pet'r Ex. I at

23 9.) The IJ observed that "while [Petitioner]'s Static-99R score places him in the lowest risk

---

24 [12] "The DSM is a handbook published by the American Psychiatric Association, used by health care

25 professionals all over the world as an authoritative guide to the diagnosis of mental disorders. It has been periodically revised since it was first published in 1952. The latest version, DSM-5 (sometimes termed

26 DSM-V), was published in 2013, after a fourteen-year revision process, and reflects the latest medical understandings of mental disorders." Acevedo Granados v. Garland, 992 F.3d 755, 760 (9th Cir. 2021).

27 [13] "Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or

28 younger)." (Pet'r Ex. G at 34 (quotation marks and citation omitted).)

1  category, this record does not show that he poses *no* risk of danger to the community.

2  Furthermore, 'safe' is not the equivalent of 'risk-free.'" (ECF No. 18-1 at 22.) However, the

3  question before this Court is not whether Petitioner presents absolutely no risk of danger. Rather,

4  the "risks must also be considered in conjunction with the next related factor—whether any risks

5  can be mitigated through alternatives to detention." <u>Doe</u>, 732 F. Supp. 3d at 1087.

6        The IJ afforded limited weight to Petitioner's Static-99R score because Petitioner's lack

7  of reoffending after being released from prison was not substantially indicative of his danger to

8  the community due to the close scrutiny of Petitioner's terms of supervised release. (ECF No.

9  18-1 at 23.) However, Petitioner can still be subject to the close scrutiny of supervised release in

10  the event he is released from ICE custody. <u>See, e.g.</u>, Order, <u>Doe v. Becerra</u>, No. 5:23-cv-04767-

11  PCP (N.D. Cal. May 15, 2024), ECF No. 56 (releasing habeas petitioner from immigration

12  detention on various conditions including home detention and location monitoring).[14]

13        Dr. Williams also administered a psychological test known as the MMPI-2RF (Minnesota

14  Multiphasic Personality Inventory, 2nd Revision, Restructured Format), which "is the most

15  common psychometric test used to assess personality traits and psychopathology. Over 10,000

16  scientific studies have been carried out over the more than 80-year history of the MMPI, making

17  it the most well researched and understood psychological test currently available." (Pet'r Ex. G

18  at 32.) "[I]t is an *objective* psychological test, scored by an impartial computer, without any input

19  or direction from the test administrator. In that sense, the results of this test are *unbiased*." (<u>Id.</u>)

20  "[A] key element of the MMPI is its ability to detect information about the test-taker that the

21  test-taker may not wish to reveal." (<u>Id.</u> at 33.) "[T]he test questions are not necessarily connected

22  to that which they measure, allowing the test administrator access to personal information

23  regardless of whether the test-taker consciously wishes that information to be shared." (<u>Id.</u>) "The

24  MMPI also contains so-called 'validity scales,'" which "assess the test taker's approach to the

25  test" and "investigate whether the test taker responded to the actual content of the items . . ., was

26  inclined to appear morally virtuous, to conceal psychological problems, to emphasize or

27

28  ---
[14] Additionally, as discussed below, the Court has considered additional conditions that would further mitigate that risk, including a limitation on contact with minors.

1    exaggerate psychological problems or to be dishonest in approaching the test." (Pet'r Ex. G at

2    32.)

3        Petitioner "produced a *valid* MMPI-2RF protocol," which "is highly significant as it

4    indicates that [Petitioner] made no effort to minimize his mental or emotional problems and was

5    frank and open as he took the test." (Pet'r Ex. G at 33.) Dr. Williams "emphasized that, in the

6    context of fitness for duty or risk assessment evaluations, it is not typical to obtain this sort of

7    validity finding," noting that "[m]any of [his] examinees in this context complete the

8    questionnaire in such a manner that concerns are raised about underreporting mental and

9    emotional problems, as they are attempting to put their best foot forward, and the MMPI can

10   detect that tendency," but that Petitioner "made no such effort to put his best foot forward and,

11   instead, completed the test honestly and accurately," which "is an indication of overall honesty

12   on the part of" Petitioner. (Id. (emphasis deleted).)

13       "The Hare Psychopathy Checklist-Revised (PCL-R) is a tool that is commonly used to

14   assess the presence and extent of the personality trait psychopathy[15] in individuals—most often

15   those institutionalized in the criminal justice system.[16] It is a 20-item inventory of perceived

16   personality traits and recorded behaviors." (Pet'r Ex. G at 35 (footnotes added).) Dr. Williams's

17   report noted that "[t]he obvious reason for assessing [Petitioner] with this measure is to

18   determine whether he is someone who would be likely to not only be dishonest about the

19   criminal charges, but would be able to convincingly lie to me, to his family, and to the court

20   about his innocence with absolutely no qualms, no guilt and no shame." (Id.) "This measure has

21   a maximum score of 60, and a score of 30 or above is suggestive of the trait of psychopathy.

22   [Petitioner] attained a score of zero." (Id.)

23       Dr. Williams testified that assuming Petitioner's offense "was a crime of violence due to

24   anger" and "motivated [by] an act of revenge against a certain individual, or there were

25   ───────────────

     [15] Dr. Williams testified that "[p]sychopathy is a conglomeration of really bad personality traits that
26   predicts criminal behavior, violence against people, lack of empathy or caring about violence against
     people, a manipulative approach; basically an individual without a conscience. Basically, a monster. You
27   don't want to be somebody who scores high on this measure who gets deemed a psychopath. It is
     somebody who's considered dangerous." (Pet'r Ex. I at 10.)
28   [16] Dr. Williams noted that "this measure was a required assessment tool when [he] was employed by the
     Board of Parole Hearings evaluating life-term inmates for parole suitability." (Pet'r Ex. G at 35.)

1  underlying emotional or traumatic issues that have been not resolved," Dr. Williams didn't

2  believe Petitioner would reoffend based on his subjective opinion and based on the testing

3  "because the PCLR looks for violent tendencies that are associated with psychopaths. And the

4  MMPI would look for violent tendencies." (Pet'r Ex. I at 16, 17.) Therefore, "setting aside the

5  Static-99," Dr. Williams testified that the "PCL goes in the direction of zero risk [of any future

6  offense] because he's not a psychopath. He's not a violent person who lacks empathy for others,

7  who enjoys hurting others," and "the MMPI did not disclose any of the psychological disorders

8  like prone to rages or bipolar disorder, especially mania . . . or borderline personality disorder. It

9  didn't find any of the mental health diagnosis that are associated with violence and loss of

10 impulse control." (Id. at 18–19.)

11        The IJ "afford[ed] limited weight to Dr. Williams' opinion regarding the likelihood of

12 [Petitioner]'s commission of a violent nonsexual crime" because Petitioner's "FBI rap sheet

13 show[ed] that he was charged with 'battery by prisoner' in 2018." (ECF No. 18-1 at 23.)

14 However, "the battery arrest on [Petitioner]'s rap sheet . . . was rejected for prosecution for lack

15 of sufficient evidence." (ECF No. 1 at 11.) Further, there is nothing in the record before this

16 Court regarding the facts underlying the alleged battery and whether any administrative

17 disciplinary proceeding occurred with respect to the alleged battery.

18        In essence, the IJ concluded that Petitioner's convictions, the facts underlying said

19 convictions, Petitioner's limited remorse, minimization of his actions, and refusal to accept full

20 responsibility for his actions outweighed Dr. Williams's expert report and opinion. However, the

21 IJ's conclusion was not based on any recent evidence of dangerousness. Further, Respondents

22 have provided no additional evidence beyond the facts and circumstances of Petitioner's past

23 convictions to suggest that he remains a danger to the community. Additionally, the IJ did not

24 address conditions that could further mitigate this risk, such as a limitation on contact with

25 minors, as discussed further below.

26        The IJ's determination that Petitioner poses a flight risk relied solely on the procedural

27 posture and predicted outcomes of his pending immigration proceedings. "Even assuming the

28 immigration judge is correct in his predictions about the likelihood that Mr. Doe will obtain the

1  relief he is seeking, however, the real question is whether Mr. Doe poses a flight risk that cannot

2  be mitigated." <u>Doe</u>, 732 F. Supp. 3d at 1087.

3      In <u>United States v. Torres</u>, the defendant was indicted in 2019 on federal charges for

4  possession with intent to distribute approximately forty-six grams of methamphetamine and

5  being a felon in possession of ammunition and had previously been convicted of five felonies:

6  "possession of marijuana for sale in 2002, assault with a deadly weapon in 2006, prisoner in

7  possession of a weapon in 2007, possession of a controlled substance in 2013, and possession of

8  brass knuckles in 2015." <u>Torres</u>, 995 F.3d at 699. Torres had "a documented history of substance

9  abuse, clear access to ammunition, a significant criminal history including violent offenses, and a

10 history of failing to appear." <u>Id.</u> at 709. Although the Ninth Circuit "conclude[d] that Torres's

11 twenty-one-month detention does not yet violate due process," the court "caution[ed] that the

12 length of Torre's detention is approaching the limits of what due process can tolerate" and that

13 "at some point, regardless of the risks associated with Torres's release, due process will require

14 that he be released if not tried." <u>Id.</u> at 709, 710.

15     In contrast, here, the facts and circumstances of Petitioner's criminal convictions and the

16 procedural posture of Petitioner's immigration proceedings suggest some risk of danger and

17 flight, but his 2011 convictions are his sole criminal convictions and there is nothing in the

18 record indicating that Petitioner has a documented history of failing to appear. Petitioner has

19 "served a full criminal sentence for [his] offense," (ECF No. 19 at 9), and his current "detention

20 d[oes] not arise from new or unpunished conduct," <u>Black v. Decker</u>, 103 F.4th 133, 151 (2d Cir.

21 2024). Further, Respondents have not provided any other evidence from the past fifteen years

22 suggesting that Petitioner is currently a danger to the community. "These risks must also be

23 considered in conjunction with the next related factor—whether any risks can be mitigated

24 through alternatives to detention." <u>Doe</u>, 732 F. Supp. 3d at 1087.

25     **G. Alternatives to Detention**

26     The fourth factor is "whether the government interests in ensuring appearance at future

27 proceedings and protecting the community could be protected through alternatives to detention

28 that are less harsh." <u>Doe</u>, 732 F. Supp. 3d at 1080. In <u>Martinez</u>, the Ninth Circuit held that "[d]ue

1    process does not require immigration courts to consider conditional release when determining

2    whether to continue to detain an alien under § 1226(c) as a danger to the community," noting that

3    "[n]owhere in Singh did we suggest that due process also mandates that immigration courts

4    consider release conditions or conditional parole before deciding that an alien is a danger to the

5    community" and declining to extend Singh's "high-water mark of procedural protections" any

6    further. Martinez, 124 F.4th at 786 (emphasis added). However, Martinez concerned a

7    procedural due process claim, and "the substantive component of the [Due Process] Clause . . .

8    protects individual liberty against 'certain government actions regardless of the fairness of the

9    procedures used to implement them.'" Collins, 503 U.S. at 125 (emphasis added) (quoting

10    Daniels, 474 U.S. at 331). Therefore, in considering Petitioner's substantive due process claim,

11    the Court finds that it may consider alternatives to detentions.

12         Respondents contend that "there is no basis for this court-of-custody to conclude,

13    contrary to the Immigration Judge's detailed discretionary findings, that an available alternative

14    to detention program can mitigate the risk posed by Petitioner's release." (ECF No. 18 at 11.) As

15    stated above, this Court is not bound by the IJ's determinations, see Doe, 732 F. Supp. 3d at

16    1086–87, and this Court is not reviewing the IJ's determinations under the abuse of discretion

17    standard, see Martinez, 124 F.4th at 784. Rather, this Court is making an independent assessment

18    of whether the government interests in ensuring appearance at future proceedings and protecting

19    the community could be protected through alternatives to detention that are less harsh in the

20    context of Petitioner's substantive due process claim.

21         Petitioner has submitted a proposed release plan, (Ex. G at 23–26), and "is further

22    amenable to GPS monitoring through ICE's Intensive Supervision Appearance Program, ICE

23    check-ins, continued classes at the Hope Program, and any other requirement the Court deems

24    necessary," (ECF No. 19 at 11). Petitioner's proposed release plan was prepared by a social

25    worker in the Immigration Unit at the San Francisco Office of the Public Defender. (Pet'r Ex. G

26    at 23.) Petitioner will live with his parents, wife, son, and siblings at a residence at which his

27    family has lived for decades. It is the same residence where Petitioner lived during his release

28    from March 2020 to June 2021, and it was previously approved by his parole officer. Although

1  Petitioner's term of parole has been discharged,[17] Petitioner "will be required to register under

2  [California] Penal Code § 290 for the rest of his life." (Pet'r Ex. G at 25.) Petitioner's friends and

3  family have offered to help Petitioner find a job in agriculture, construction, or landscaping.

4  (Pet'r Ex. G at 25–26.)

5      Respondents contend that "DHS ICE's supervision programs are not designed for, and

6  have not been demonstrated to be sufficient to, protect the community from non-citizens whose

7  release would pose a danger to persons or property," citing to DHS, Privacy Impact Assessment

8  for the Alternatives to Detention Program at 3 (Mar. 17, 2023) (noting that "ICE ATD programs

9  are flight-mitigation programs"). (ECF No. 18 at 9.) As Respondents do not provide any

10  information regarding alternatives to detention, the Court finds Doe's discussion informative:

> ICE's Intensive Supervision Appearance Program offers several
> alternatives to detention at a facility like GSA, including GPS
> tracking (e.g., ankle monitors), a smartphone app, or reporting by
> telephone. Dkt. No. 50, at 42; *see also* ICE, Alternatives to
> Detention, perma.cc/384H-HCLY.
>
> The evidence before the Court suggests that alternatives like these
> could reduce Mr. Doe's flight risk. In a report on the Intensive
> Supervision Appearance Program, the Department of Homeland
> Security recently stated that the "vast majority" of program
> participants over five years "were compliant with the requirements
> of the program. The success rate for single adults ... ranged from
> 72.7 percent to 88.9 percent." Dkt. No. 50, at 44. ICE data for 2023
> shows that participants in these programs appeared at 99.1% of
> hearings, including 93.6% of final hearings. Dkt. No. 50, at 28.
> And these statistics are not disaggregated by the type of
> monitoring. Even assuming Mr. Doe poses a flight risk as the
> immigration judge found (which Mr. Doe disputes), ICE's
> statistics suggest that the risk can be significantly mitigated
> through GPS tracking or other alternatives.
>
> The government emphasizes that there is no basis to conclude that
> alternatives could mitigate any danger posed by Mr. Doe to the
> community, arguing that ICE's alternatives are "flight-mitigation
> programs" not designed to mitigate dangerousness. Mr. Doe
> counters that the government has not presented arguments or
> evidence suggesting that alternatives cannot address risk of danger.
> Mr. Doe points to studies from the criminal context suggesting that
> electronic monitoring can reduce recidivism. One reason it is
> difficult to speculate about how GPS tracking or other alternatives
> might mitigate any danger that Mr. Doe poses to the community is

---

[17] At the November 19, 2025 hearing, counsel for Petitioner confirmed that Petitioner was no longer on parole.

1
2
3
4

> that the immigration judge's dangerous determination, based only
> on Mr. Doe's past convictions, is inherently vague. In the abstract,
> though, someone who knows their location is being monitored will
> face at least some additional incentive not to engage in criminal
> conduct. The evidence provides at least some indication that
> monitoring programs can mitigate risks of recidivism.

Doe, 732 F. Supp. 3d at 1088. "In sum, the evidence regarding alternatives suggest that GPS

monitoring or other programs can significantly mitigate flight risk and potentially mitigate any

danger to the community." Doe, 732 F. Supp. 3d at 1088. Additionally, Petitioner has agreed to

be subject to a limitation on contact with minors, which will further mitigate any risk of danger.

### H.  Conditions of Detention

In the context of addressing whether "ICE's COVID-19 policies reflected

unconstitutional 'punishment' under the Fifth Amendment," the Ninth Circuit stated:

> "[U]nder the Due Process Clause, a detainee may not be punished
> prior to an adjudication of guilt in accordance with due process of
> law." *Wolfish*, 441 U.S. at 535, 99 S.Ct. 1861. We have thus held
> that "a civil detainee awaiting adjudication is entitled to conditions
> of confinement that are not punitive." *Jones v. Blanas*, 393 F.3d
> 918, 933 (9th Cir. 2004). "[A] restriction is 'punitive' where it is
> intended to punish, or where it is 'excessive in relation to its non-
> punitive purpose,' or is 'employed to achieve objectives that could
> be accomplished in so many alternative and less harsh methods.'"
> *Id.* at 933–34 (alteration accepted) (first quoting *Demery v. Arpaio*,
> 378 F.3d 1020, 1028 (9th Cir. 2004); and then quoting *Hallstrom
> v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993)). But
> "if a particular condition or restriction of pretrial detention is
> reasonably related to a legitimate governmental objective, it does
> not, without more, amount to 'punishment.'" *Wolfish*, 441 U.S. at
> 539, 99 S.Ct. 1861.

Fraihat v. U.S. Immigr. & Customs Enf't, 16 F.4th 613, 647 (9th Cir. 2021). In the context of a

former state prisoner who was civilly detained pending proceedings under California's SVPA,

the Ninth Circuit stated that "[t]he civil nature of SVPA confinement provides an important gloss

on the meaning of 'punitive' in this context. Because he is detained under civil—rather than

criminal—process, an SVPA detainee is entitled to 'more considerate treatment' than his

criminally detained counterparts." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004) (quoting

Youngberg v. Romeo, 457 U.S. 307, 321–22 (1982)). Thus, "due process sets an absolute floor

on the conditions civil detainees can be confined in. At a minimum, conditions must be less

1   restrictive than post-conviction criminal detention." Doe, 732 F. Supp. 3d at 1088.

2       As this litigation was ongoing, Petitioner was transferred from GSA to California City.[18]

3   (ECF No. 20 at 4.) Petitioner declares:

4       The guards do "count" five times during the day and two times at
        night. Each count is supposed to take 35 minutes but often they
5       take more than an hour and even up to two hours. During count we
        have to stay in our cells, so we can't go out to recreate, use the
6       shower or make a phone call. This means that we are locked in our
        cells for 7 hours or more a day for count. Even when I was in
7       prison, we were not locked in our cells for this long.

8   (ECF No. 20 at 4.) Petitioner declares that in the first two weeks since he was transferred to

9   California City,[19] he has had yard time only once and that consisted of taking detainees to the

10  back of the building to a dusty cage. There was no gym equipment or anything else to play with,

11  and the temperature was in the high 90s with no shade. (Id. at 4–5.) Petitioner has declared that

12  in all the prisons in which he was previously incarcerated while serving his criminal sentence, he

13  could be in the yard for longer than he could at GSA, which provided for four hours of yard time.

14  (Doe Decl. ¶¶ 21, 23, ECF No. 1-16.) California City provides even less yard time than GSA.

15      Petitioner describes California City as "dirty and unhygienic" and "covered in dust and

16  grime." (ECF No. 20 at 5.) Detainees are expected to clean the main area and cells themselves,

17  but they are not provided with proper cleaning supplies. Petitioner declares that they are not

18  given enough clean water. The tap water has black specks in it, and the five-gallon container of

19  clean water for the main area quickly runs out because it serves eighty people. There are no hot

20  water dispensers, and there is only one microwave for eighty people.

21      Petitioner declares that California City has a prison layout. In Petitioner's dorm, detainees

22  are in cell living with two men to a cell and then a main area. (ECF No. 20 at 4.) Petitioner

23  declares there is no privacy. He shares a toilet with his cellmate. Showering is in the main area

24  with a four-foot wall separating the stalls that detainees can easily see over. Petitioner feels he is

25

26  [18] Petitioner's understanding is that California City used to be a prison used by the CDCR, but the
    contract was not renewed, and California City recently reopened as an ICE facility operated by
27  CoreCivic. (ECF No. 20 at 4.)
    [19] Petitioner was transferred to California City on August 29, 2025, and Petitioner's declaration was filed
28  on September 11, 2025. (ECF No. 20 at 4.)

1  constantly being watched, which makes him especially nervous because he was sexually

2  assaulted at GSA.[20] (ECF No. 20 at 5.) The hot water in the showers is inconsistent with some

3  showers having hot water and others not having hot water no matter how long you wait for them

4  to warm up. Petitioner declares that commissary items are extremely expensive. For example, a

5  tube of toothpaste is $13 and an eight-ounce jar of Folgers coffee is $17, which is double what

6  detainees would pay for the same items at GSA. (ECF No. 20 at 5.) Petitioner previously

7  declared that "commissary at GSA is much more expensive than in prison. A soup in prison was

8  25 cents, here it's 53 cents. A toothpaste in prison was $4 and here it's $7. It's nearly double the

9  price on most items." (Doe Decl. ¶ 29.)

10      Petitioner declares that for the first three days he was not given his prescribed Wellbutrin

11  medication and for the first two days he was not given his prescribed Celexa medication. He is

12  given his medication at awkward times that do not make sense. For example, he has given

13  medication at 3 a.m. and 1:30 a.m., which is disruptive to Petitioner, who should take his

14  medication at the same time every day, and Petitioner's cellmate who is woken up when this

15  occurs. (ECF No. 20 at 5.)

16      Petitioner declares that in the first two weeks since he was transferred to California City,

17  detainees have not had access to the library. He was given two-inch pencils but no other writing

18  materials. There is no vocational training, jobs, or meaningful ways to fill Petitioner's time. He's

19  in a locked cell for most of the day. (ECF No. 20 at 4.) In contrast, there was vocational training

20  and jobs available in prison. (Doe Decl. ¶ 24.)

21      Respondents have not submitted any evidence to dispute Petitioner's account of his

22  conditions of confinement. Indeed, despite being invited to submit argument and evidence

23  regarding these factors, Respondents have chosen not to submit any evidence at all regarding

24  Petitioner's conditions of confinement.

25          Determining whether the conditions at [California City] are worse
            "as a whole" than at the state facilities where Mr. Doe was
26

---

27  [20] In 2022, another detainee started touching Petitioner inappropriately and in a sexual way. Petitioner
    made a Prison Rape Elimination Act ("PREA") complaint against him. An investigation was conducted,
28  and Petitioner's allegation was found "substantiated." (Doe Decl. ¶ 8.)

> imprisoned is a difficult comparison that would require
> comprehensive evidence. But the evidence now before the Court at
> least suggests several important ways in which the conditions at
> [California City] are not only inherently harsh but also worse than
> the conditions Mr. Doe faced in state prison. At minimum, the
> Court must weigh these conditions appropriately in considering the
> burden imposed by the duration of Mr. Doe's detention.

Doe, 732 F. Supp. 3d at 1089.

## I.    Conclusion

On balance, the five factors demonstrate that Petitioner's prolonged immigration detention has become excessive in relation its regulatory purpose. The Court recognizes that the "government has an obvious interest in 'protecting the public from dangerous criminal aliens,'" a "strong interest in preventing aliens from 'remain[ing] in the United States in violation of our law,'" and "[t]hrough detention, the government likewise seeks to 'increas[e] the chance that, if ordered removed, the aliens will be successfully removed.'" Rodriguez Diaz, 53 F.4th at 1208 (quoting Demore, 538 U.S. at 518, 515, 528). Moreover, "[t]hese are interests of the highest order that only increase with the passage of time." Rodriguez Diaz, 53 F.4th at 1208. "The longer detention lasts and the longer the challenges to an IJ's order of removal take, the more resources the government devotes to securing an alien's ultimate removal. The risk of a detainee absconding also inevitably escalates as the time for removal becomes more imminent." Id. However, Respondents have not shown that the government's interests cannot be protected through alternatives to detention and imposition of various conditions of supervision.

Based on the foregoing, the Court finds that Petitioner's continuing detention violates his substantive due process rights and the petition for writ of habeas corpus will be granted. "Federal habeas corpus practice, as reflected by the decisions of [the Supreme] Court, indicates that a court has broad discretion in conditioning a judgment granting habeas relief. Federal courts are authorized, under 28 U.S.C. § 2243, to dispose of habeas corpus matters 'as law and justice require.'" Hilton v. Braunskill, 481 U.S. 770, 775 (1987). "[H]abeas corpus is, at its core, an equitable remedy." Schlup v. Delo, 513 U.S. 298, 319 (1995). "Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." Lemon v. Kurtzman, 411 U.S. 192, 200 (1973) (footnote omitted).

Here, the Court finds that Petitioner's release from immigration detention is the appropriate remedy and will ask the parties to propose appropriate conditions so that the government's significant interests in ensuring Petitioner's appearance at future proceedings, protecting the community, and that, if ordered removed, Petitioner will be successfully removed, are protected.

### III.

### ORDER

Accordingly, the Court HEREBY ORDERS that:

1.  The petition for writ of habeas corpus is GRANTED;

2.  On or before Tuesday, November 25, 2025, at 10:00 a.m., the parties SHALL meet and confer and submit a joint statement regarding proposed conditions of release, which shall include GPS location monitoring, appointment of a responsible custodian, a limitation on unsupervised contact with minors, and any other conditions the government believes will mitigate the risks involved in Petitioner's release from detention;[21]

3.  Respondents shall be prepared to release Petitioner on conditions by 5 p.m. on November 26, 2025, or as soon thereafter as ordered by the Court; and

4.  The Clerk of Court is DIRECTED to:

    a.  Substitute Christopher Chestnut in the place of Minga Wofford;

    b.  Substitute Sergio Albarran in the place of Moises Becerra; and

    c.  Dismiss remaining named Respondents.

IT IS SO ORDERED.

Dated:    __November 20, 2025__         /s/ _Erica P. Grosjean_
                                        UNITED STATES MAGISTRATE JUDGE

---

[21] Counsel may refer to the district court's order in <u>Doe v. Becerra</u>, No. 5:23-cv-04767-PCP (N.D. Cal. May 15, 2024), ECF No. 56, for potential conditions that can be ordered by the Court.